LEMMON, Judge.
Mr. and Mrs. Carl Morris and their insurer have appealed from a judgment which awarded plaintiff damages resulting from injuries sustained in an automobile accident. Plaintiff has also appealed, seeking an increase in the award.
The accident occurred in mid-morning on a clear, dry day at the intersection of Veterans Highway and Cleary Avenue in Jefferson Parish. At that point Veterans Highway for eastbound traffic was a three-lane thoroughfare, with a fourth lane for traffic desiring to turn left on Cleary *160 at the intersection or to make a U-turn in a special lane before the intersection. Dashed white lines divided the through lanes, and a solid white line separated the left-turn lane from the leftmost of the through lanes.
Plaintiff had stopped at the intersection in obedience to a red traffic signal and was the first car in line in the left lane. After being stopped for a period of time, she was suddenly struck from the rear by a vehicle driven by Roy Cunningham. The two drivers exited the cars and met at the point of collision to check on injuries and survey the damage.
Plaintiff testified that Cunningham was very nervous and upset; that when it became apparent he was not going to call the police, she decided to do so and returned to her car to turn off the ignition; that she heard a scraping sound when she started to open the door, and as she turned to see the cause, a white car (driven by Mrs. Morris) struck her on the thigh and scraped her door, throwing her against the car; and that the white car proceeded through a red light and left the scene. (Mrs. Morris did not testify because of incapacity, but testimony by plaintiff, Cunningham and the investigating officer established that Mrs. Morris returned to the scene sometime during the police investigation.)
The trial court found Cunningham and Mrs. Morris were both liable for plaintiff’s injuries, but limited the judgment against Cunningham’s insurer to the amount of its policy.[1] Since this insurer did not appeal and in fact has paid the judgment, Cunningham’s liability is not before us.
On the issues of Mrs. Morris’ liability and plaintiffs contributory negligence, Cunningham testified that when plaintiff returned to her car, he moved to the back of his car to raise the trunk to warn approaching traffic and while doing so noted a “white flash” pass by, but neither saw nor heard anything in connection with the collision.[2] He did state that Mrs. Morris left the scene and that plaintiff told him immediately after the accident that the car had struck her and the door and had knocked her against the automobile.
Thus, we must determine the liability issues principally from the testimony of plaintiff and the investigating officer and from photographs of the scene and of the damage to the automobiles.
In urging reversal on liability, Mrs. Morris argues that her mere use of the left-turn lane to pass the accident was not negligent behavior. We agree. A motorist certainly may pass cars at rest in one lane after an accident by using an adjacent lane (even if that lane is designated for left-turning traffic) as long as the passing motorist exercises reasonable care in doing so. The circumstances indicate, however, that Mrs. Morris did not use reasonable care in passing the accident in the present case.
The lanes were eleven feet wide. Although the record does not indicate the distance plaintiff’s car was located from the left edge of her lane, there was more than adequate room for Mrs. Morris to swing wide of the stopped cars and to pass them safely by maintaining proper control and a safe speed.
While there was no direct evidence as to specific substandard behavior by Mrs. Morris, the fact remains that she did not pass the cars safely when she saw or should have seen plaintiff and Cunningham standing by the side of their cars and when she had' approximately eleven feet within which to safely perform the passing maneuver. This fact constitutes circumstantial evidence indicating it was more probable than not that her failure to exercise reasonable care was a cause of the ac *161 cident. We conclude her negligence as a legal cause of the accident has been proved by a preponderance of the evidence.
Alternatively, defendants contend plaintiff was contributorily negligent in opening the door to her car on the side available to moving traffic before it was reasonably safe to do so in violation of R.S. 32:283. We disagree.
The Supreme Court has rejected the terminology and concept of “negligence per se” and has held that the violation of a penal statute does not automatically constitute negligence. Weber v. Phoenix Assur. Co. of N. Y., La., 273 So.2d 30 (1973). Reference may be had to a penal statute, however, in determining the reasonableness of a person’s behavior under existing circumstances.
Although plaintiff testified she had not yet opened the door when she heard the scraping noise, she conceded she must have opened the door in turning, because the policeman later had to force the door shut. The photographs of the angle of damages also support a conclusion that the door was slightly open at the time of impact.
Even if plaintiff opened the door slightly, we nevertheless conclude that under the totality of circumstances this was at most a technical and insignificant violation of a penal statute and was not a substantial factor in causing the accident. See Laird v. Travelers Ins. Co., 263 La. 199, 267 So.2d 714 (1972).
In the first place plaintiff was already standing on the outside of her car, and no additional obstruction was created by her opening the door slightly. In fact, there was no evidence whatsoever that plaintiff in standing alongside the car or in opening the door slightly, moved out of her own lane and into the adjacent lane or in any manner created any situation which would present difficulty to a careful motorist in passing the stopped cars.
Furthermore, one of the principal purposes of the pertinent statute was to protect a passing motorist from the completely unexpected intrusion of a car door into his lane when a person exits from a stopped car; however, when on the other hand a person opens the door to enter a stopped car, the presence of the person outside the car has already alerted any passing motorist of the danger of passing too closely to the stopped vehicle.
Finally, the evidence does show that plaintiff’s vehicle had a damaged left rear panel which the owner verified was not present before the accident. This damage, reasonably attributable to the accident, indicates Mrs. Morris scraped the rear side of plaintiff’s car before striking the slightly opened door.
Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, the standard being that of a reasonable man under like circumstances. Smolinski v. Taulli, La., 276 So.2d 286 (1973). We conclude that plaintiff’s action in opening the door slightly into an area which the plaintiff already occupied, when Mrs. Morris had approximately 11 feet within which to pass in the adjacent lane, does not constitute contributory negligence which was a substantial factor in causing the accident, particularly since Mrs. Morris apparently first struck the rear of plaintiff’s car. Defendants have thus failed to prove contributory negligence as a legal cause of the accident.
QUANTUM
On the day after the June 8, 1971 accident, plaintiff consulted Dr. William Pusa-teri, an orthopedic surgeon, complaining of pain in the head, neck and left hip. The doctor found obvious spasm of the musculature in several areas of the cervical spine and a limited range of neck motion, as well as tenderness and discoloration of the left *162 thigh and a hematoma of the skull. He diagnosed acute cervical strain, contusion of the thigh and hematoma of the skull. Because of plaintiff’s emotionally upset condition, he hospitalalized her at complete bedrest, traction and medication.
When plaintiff improved except for persistent headaches, the doctor sent her home on June 15, instructing her to remain in bed in traction or to wear a cervical collar when out of bed. In treatment as an outpatient, plaintiff complained of pain and was emotionally upset. The doctor instructed her to increase her activity and begin diathermy treatments. The spasm abated, and plaintiff regained her range of motion, but she felt she was not progressing and did not return after June 28.
On July 1, 1971, still complaining of persistent headaches, plaintiff consulted a neurosurgeon who recommended psychiatric treatment, because of her emotional condition, and further orthopedic treatment.
On July 13, 1971 plaintiff consulted Dr. Raymond Haddad, an orthopedist, who had treated her five years earlier for a whiplash injury. The examination revealed tenderness and spasm in the cervical area, and the doctor hospitalized her at bedrest, traction and supportive physical therapy. During the course of the 29-day confinement, plaintiff also received psychiatric treatment, was administered pelvic traction for back complaints, was examined by an internist for numerous complaints of dizziness, and, on one occasion, was given medication for diarrhea. After plaintiff was discharged with slight improvement, Dr. Haddad treated her as an outpatient with physical therapy and injections for muscle relaxation through the remainder of 1971.
The psychiatric treatment during the same period was administered by Dr. Charles Smith, who had treated plaintiff in 1968 and 1969 for depression incidental to marital problems.[3] Dr. Smith diagnosed anxiety and neurosis with depressive features, observing that she was obsessed with the accident. He prescribed various medications and, after the hospital confinement, encouraged her to engage in activities outside of the home and to attempt to return to her previous work as a mechanical model.[4]
In January, 1972 Dr. Haddad advised against working as a mechanical model, because the work required extended periods of flexing the neck forward, a position which aggravated the cervical problem.
On April 5, 1972 plaintiff complained of particular difficulty caused by holding her neck in one position for an extended period during an automobile trip. Plaintiff had contracted to work as a mechanical model in a four-day show beginning April 12, but Dr. Haddad advised against it. Nevertheless, plaintiff attempted the job, but had to stop after one hour because of neck pain. At an April 25 examination Dr. Haddad found spasm and administered injections and therapy.
Plaintiff’s depression deepened, and Dr. Smith hospitalized her in the psychiatric ward from May 16 to May 19, 1972.
Plaintiff thereafter became active in secretarial work and other outside activities. In June, 1972 Dr. Smith found her to be less depressed and more relaxed and emotionally stable. She did not see Dr. Smith after August, her stated reasons being that she did not have the money and she was getting better emotionally.
In the meantime, when plaintiff developed a recurrence of cervical pain and *163 complained of numbness in the arms, Dr. Haddad recommended a neurological consultation, which was performed in August.
No further action was taken until December, 1972, when plaintiff returned with the same complaints. Dr. Haddad recommended myelographic testing, but plaintiff declined.
After an acute episode of neck pain in January, 1973, plaintiff did not again consult Dr. Haddad for neck pain until October, 1973, although he treated her that summer for a fractured toe.
Dr. Haddad’s final diagnosis was acute and chronic cervical strain, worsened by plaintiff’s emotional reaction to the accident. He did not believe plaintiff had a herniated disc and did not expect any permanent anatomical disability, although he assigned a five to ten per cent functional disability as to her work as a mechanical model after initial periods of difficulty. He observed that she was “getting better” until the onset of arm complaints in the latter part of his treatment. He could not account for these complaints.
As to the psychiatric aspect, Dr. Smith testified that plaintiff was a basically insecure person; that the earlier neurosis had been triggered by a family relationship, but she had been discharged as better able to cope with the relationship; that a neurosis tends to recur under stress; that the 1971 accident was a stressful event which aggravated the basic problem; that plaintiff thrived on activity, and the accident limited her physical activity, which was her method of handling the neurosis; and that as of the last visit, she was improved, but that while symptoms of anxiety and depression tend to recur under stress, adequate treatment and emotional growth lessen the tendency to succumb to stress.
There was also evidence that the emotional disturbance brought on mucous colitis. After eight days of hospitalization in March, 1972, with treatment and medication, plaintiff had no further problems in this respect.
In early 1973 plaintiff was examined by two specialists in regards to her complaints of persistent dizziness. The ear specialist ruled out disease of the inner ear, but found a nystagmus related to the brain or its connections. Since this symptom is commonly found in flexion and extension injuries, he referred her back to the cervical specialist. A neurosurgeon found no neurological disability, but did find numbness in the arms, to which he attached no neurological significance, suggesting that the condition was an emotional response.
At the time of trial in March, 1974, plaintiff stated she was well adjusted mentally as long as she kept active; she no longer had headaches; she still took muscle relaxants; she occasionally used traction when her cervical condition flared up, as in bad weather; and she generally felt good except for episodes of pain, although she did not believe she could work as a mechanical model for a full show.
On the issue of loss of wages and impairment of earning capacity, plaintiff had achieved success in the early 1960’s in her career as a mechanical model and had appeared in commercials and guest appearances on television, in department store ex- ■ hibits, and in trade shows where she demonstrated products mechanically. By mental control and concentration she could remain motionless for hours or stare without blinking for as long as 15 minutes.
By 1965 she was earning as much as $150.00 per day in trade shows. She reported net earnings of $2,900.50 in 1965 and $6,175.00 in 1966. However, she discontinued her act in 1966 because traveling took too much time from family responsibilities.
From 1966 until 1971 she performed only in shows for charity in New Orleans. Because of family financial problems, she again sought employment in modeling in *164 early 1971 and performed in three four-day trade shows, earning $150.00 per day plus expenses. She was scheduled for other shows in 1971, but had to decline because of her injury.
In April, 1972 plaintiff unsuccessfully attempted to perform in a trade show as previously noted. In August, 1973 she attempted a show for another employer, but was unable to complete the performance. The two persons who hired her for these two shows testified that they would have used her in other trade shows if she had been physically able to perform.
The trial judge awarded $30,000.00 for “physical and mental pain and suffering and loss of wages”, in addition to $6,724.54 in medical expenses.[5]
We reject defendants’ argument that the award was excessive. Plaintiff proved that she suffered from the cervical strain for a substantial period of time, that the accident caused a reactivation of the neurosis which was previously under control, and that between the time of the accident and the trial she more probably than not would have earned a considerable amount of wages, based on her record of past earnings and the probability that (but for the accident) she would have earned similar wages during the pertinent period.
We also reject, however, plaintiff’s argument that the award was inadequate. There was no medical evidence of any permanent anatomical disability. Neither plaintiff nor Dr. Smith testified as to continuing psychiatric problems. And most importantly, the medical evidence did not support plaintiff’s claim that she was unable to work as a mechanical model at the time of trial. While Dr. Haddad did assign a small functional disability as to that particular type of work, he stated a prognosis that she should be able in time to function in this capacity with decreasing difficulty.
On the basis of this record we cannot say that the award constituted an abuse of the “much discretion” vested in the trial judge. C.C. art. 1934(3).
The judgment is affirmed.

. Cunningham, though sued, was never served.

. For purposes of reviewing Mrs. Morris’ liability, we, have disregarded Cunningham’s earlier inconsistent written statement.

. The doctor stated plaintiff had recovered after psychotherapy.

. Plaintiff had developed the art of mechanical modeling, in which she assumed the position of a mannequin and used mechanical movements so that it was difficult to detect whether she was a live person or a motorized robot.

. The charges by Dr. Smith and Dr. Haddad each exceeded $1,000.00, and the charges for the two periods of hospitalization in 1971 exceeded $2,700.00.